### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EQUALLA JENKINS | : | Case No.: 3:16-cv-149 |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| HOUSING AUTHORITY OF | : | |
| THE TOWN of MANSFIELD and | : | |
| REBECCA FIELDS, individually and | : | |
| in her official capacity as Executive | : | |
| Director of the Housing Authority of the | : | |
| Town of Mansfield | : | |
| | : | |
| Defendants | : | February 1, 2016 |

## COMPLAINT

### PRELIMINARY STATEMENT

1.      Plaintiff Equalla Jenkins brings this civil rights action for declaratory, injunctive, and monetary relief against Defendants Housing Authority of the Town of Mansfield ("Mansfield Housing Authority" or "MHA") and Rebecca Fields, individually and in her official capacity as Executive Director of MHA (collectively, "Defendants") for systematically and unlawfully discriminating against Ms. Jenkins and other African-Americans in the operation and administration of the MHA's Section 8 Housing Choice Voucher ("HCV program) in violation of the Fair Housing Act; for depriving Ms. Jenkins of constitutionally-protected property interests without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution; and for repeated violations of the United States Housing Act of 1937 and the regulations promulgated thereunder.

2.      Ms. Jenkins is an African-American single mother who, at all times relevant, was on the waiting list for and eligible to receive a Section 8 Housing Choice Voucher (HCV) from the MHA.

3.      Defendants maintain a policy that requires applicant families to earn income at or above $165 per month to be eligible for admission to their HCV program.

4.      Defendants' policy of excluding families with incomes below $165 per month violates federal statutes and regulations and the stated purpose of the program.  No statute or regulation permits Defendants to require applicants for the HCV program to meet a minimum income requirement to qualify for this program.  In fact, the U.S. Department of Housing and Urban Development ("HUD") expressly prohibits such requirements.[1]

5.      At the time Ms. Jenkins reached the top of the MHA's HCV waiting list, she satisfied the minimum income requirement.  Defendants nevertheless denied her application in violation of their obligations under the HCV program based solely on speculation that she might lose her job at some point in the future and consequently be unable to pay her minimum share of the rent.

6.       Defendants intentionally discriminated against Ms. Jenkins on the basis of race in violation of fair housing laws when they refused to issue her a voucher by imposing arbitrary, unwritten, and impermissible requirements on her family; by making material misrepresentations and omissions concerning the resources in and characteristics of MHA's service area, including suggesting that living there would have been difficult or impossible; and by making false or misleading statements intended to discourage her from participating in its HCV program.

7.      MHA's minimum income requirement discriminates on the basis of race in violation of the Fair Housing Act because it categorically excludes from participation in the HCV program all

---

[1] See, e.g., *Expanding Opportunities to House Individuals and Families Experiencing Homelessness through the Public Housing (PH) and Housing Choice Voucher (HCV) Programs*, U.S. Department of Housing and Urban Development, Sept. 2013, at 7, *available at* https://portal.hud.gov/hudportal/documents/huddoc?Id=PIH2013-15homelessqas.pdf (hereinafter "*Expanding Opportunities*").

zero-income families and families with incomes below $165 per month, who are disproportionately African-American.

8.      Defendants' policies, practices, and procedures in the administration of the HCV program systematically create and perpetuate racial segregation by:

a.      deliberately providing false and misleading information or withholding information based on stereotypes about the housing-related desires of African-American families so as to discourage them from applying for and participating in the program;

b.      steering African-American families toward racially concentrated areas;

c.      failing to conduct meaningful and accurate outreach to racially concentrated areas;

d.      selectively applying additional criteria to eligible families, such as the unwritten requirement imposed on Ms. Jenkins that she must prove she owns a vehicle validly registered in-state in order to participate in the HCV program;

e.      utilizing a local preference system that gives priority to applicants currently residing within MHA's service area, who are overwhelmingly non-Hispanic White, reducing the likelihood that eligible African-American families are able to obtain vouchers; and

f.      erecting or exacerbating known barriers that Defendants knew prevented low-income families in racially concentrated areas from fully taking advantage of its housing programs.

9.      Further, upon information and belief, MHA improperly adopted its minimum income requirement.  The change in policy was a significant amendment to MHA's Agency Plan and therefore could not be implemented until after consultation with the resident advisory board, public

notice, a public hearing or public meeting of the board of directors, and review by HUD.  *See* 42 U.S.C. § 1437c-1(g); 24 C.F.R. § 903.21.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 3613.

11.     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b), as the acts complained of occurred in the District of Connecticut and Defendants reside in the District of Connecticut.

## PARTIES

12.     Plaintiff Equalla Jenkins is a resident of Connecticut who is presently homeless.

13.     Defendant Mansfield Housing Authority is a public corporate body and politic that has the power to sue and be sued.  *See* Conn. Gen. Stat. §§ 8-40 and 8-44(a).  It operates the Section 8 Housing Choice Voucher program for the towns of Mansfield, Ashford, Coventry, Chaplin, and Willington pursuant to the terms of the United States Housing Act, 42 U.S.C. §1437 *et seq.*  Its principal offices are located at 309 Maple Road, Storrs, Connecticut 06268.  All references to MHA include any individual acting on behalf of or under the authority derived from MHA.

14.     Defendant Rebecca Fields is sued both individually and in her official capacity as the Executive Director of MHA.  In that capacity, she is responsible for the administration and operation of MHA's programs, including its HCV program.

## BACKGROUND

**A.      Overview of the Section 8 Housing Choice Voucher Program.**

15.     The Section 8 Housing Choice Voucher program is the "federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent,

safe, and sanitary housing in the private market."[2]  Under the program, HUD enters into annual contracts with local housing agencies, like MHA, to fund and administer rent assistance in the form of Section 8 vouchers.

16.    Under the HCV program, unlike traditional public housing, the rent subsidy attaches to a participant family rather than to a particular housing complex.  Participants use the HCV to search for and select housing available in the private market, including single-family homes, townhouses, and apartments.  The public housing agency ("PHA") administering the program then determines whether the unit meets HUD requirements, including rent and housing quality standards.  When a family's unit and tenancy are approved, the PHA contracts with the owner to make rent subsidy payments to the owner on behalf of the family.  The tenant family enters into a lease with the landlord/owner and pays the owner between 30 and 40 percent of their adjusted monthly income toward the rent while the PHA pays the balance.

17.    PHAs must administer their programs in accordance with rules prescribed by HUD.  Low-income families and individuals may apply for HCVs at any authorized housing agency when its waiting list is open.  Each HCV program must be open to all applicants, not just local residents.

18.    PHAs may only deny assistance to applicants where grounds exist to do so, and even then have broad discretion to consider mitigating circumstances such as the seriousness of the offense and the effects of denial on other family members. 24 C.F.R. § 982.552(c)(2)(i); *see also* 66 Fed. Reg. 28776, 28782-28783 (May 24, 2001).

19.    Federal regulations specify various categories of applicant families that are income-eligible to participate in the HCV program.  "To be income eligible, an applicant must be a family in any

---

[2] *Section 8 Fact Sheet*, U.S. Department of Housing and Urban Development, *available at* http://portal.hud.gov/hudportal/HUD?Src=/topics/housing_choice_voucher_program_section_8.

of the [enumerated] categories." 24 C.F.R. § 982.201(b)(1).  These categories include: extremely low-income families, whose income is between 0 and 30 percent of the adjusted median income (AMI) for the area, adjusted for family size; very low-income families, whose incomes are below 50 percent of the AMI; and low-income families, who are between 50 and 80 percent of the AMI. *Id.* § 5.603(b).  Any family that is extremely low-income or very low-income is income-eligible for the HCV program.[3]  *Id.*

20.     Any family that has no income is income-eligible for the HCV program.  *See id.*

21.     A PHA may adopt a local policy permitting the admission of an additional category of "low income" families based on criteria specified in the administrative plan.  24 C.F.R. § 982.201(b)(1)(iii).  The additional category must be established in order to "address essential local housing needs." *See* Housing Choice Voucher Program Guidebook § 5.2.

22.     The establishment of "additional criteria" by the PHA does not impact the eligibility of an applicant who is within any of the other federally mandated categories of income-eligibility.  24 C.F.R. § 982.201(b)(1)(iii).  Accordingly, a family defined as "very low income" or "extremely low income" is income-eligible for the HCV program regardless of whether it meets additional PHA-specified criteria.  *Id.* § 982.201(b)(1)(i).

23.     After a family is determined to be eligible for the HCV program and is issued a voucher, it searches for a suitable rental unit to submit for PHA approval.  The PHA evaluates the suitability of the selected unit and calculates the family's share of the rent and total PHA subsidy.  Federal regulations specify the formula for determining the total tenant payment (TTP) for a family

---

[3] Families that are low-income are income-eligible if they have been continually assisted by a federal housing program.  24 C.F.R. § 982.201(b)(1).

participating in the HCV program.  The family pays the highest of: (1) thirty percent (30%) of its monthly adjusted income; (2) ten percent (10%) of its monthly gross income; (3) an amount specifically designated by a public agency making welfare payments (if applicable); or (4) a minimum rent amount as determined by the PHA.  24 C.F.R. §  5.628(a).

24.     PHAs are required to set minimum rents of between $0 and $50 that must be paid by an assisted family pursuant to the Quality Housing and Work Responsibility Act ("QHWRA") enacted in 1998.  *See* 42 U.S.C. § 1437a(a)(3)(A).

25.     The minimum rent requirement applies to calculation of rent *after* a family has been accepted into the HCV program.  It is not a criterion for determining eligibility.

26.     Inability to pay the minimum rent may not be used as grounds to reject an applicant from the HCV program.  *See* 65 Fed. Reg. 16692-01, 16703.

27.     Although a PHA may not approve a tenancy if the family's share of the rent would exceed 40 percent of its monthly adjusted income, a PHA only makes this determination after a participant family selects a unit, and the cap only applies if the gross rent (rent plus utilities) exceeds the applicable payment standard, which is the maximum PHA subsidy payment for a particular family.  24 C.F.R. §  982.305(5).  The limitation does not mean that the family cannot be assisted under the HCV program, but only that the particular unit will be denied and the family will need to search for a qualifying unit.[4]

28.     QHWRA permits PHAs to make certain amendments or modifications to policies, rules, or plans.  A "significant amendment" or modification may not be adopted and implemented until there is consultation with the resident advisory board, public notice, a public hearing or public

---

[4] *Expanding Opportunities* at 7-8.

meeting of the board of directors, and review by HUD. 42 U.S.C. § 1437c-1(g); 24 C.F.R. § 903.21.

29.     QHWRA and HUD allow PHAs to define the term "significant amendment" at the local level as part of the public participation in the PHA planning process. 64 Fed. Reg. 56844, 56850 (Oct. 21, 1999). PHAs must identify in the agency plan the basic criteria for determining a substantial deviation or amendment. 24 C.F.R. § 903.7(r)(2).

**B.     Fair Housing Obligations in the Administration of the HCV Program**

30.     The HCV program enables beneficiaries to choose the type and location of housing that best fits their needs, allowing recipients to live in high-opportunity areas with low poverty levels, good schools, high-quality public services, and employment opportunities.

31.     The HCV program is also intended to further racial integration by enhancing the ability of families to find affordable housing in areas from which they would otherwise be excluded.[5]

32.     In the administration of the HCV program and all other housing programs, PHAs are required to comply with all relevant aspects of state and federal fair housing laws which prohibit intentional discrimination on the basis of race and policies and practices that disproportionately affect members of protected classes.

33.     While PHAs have some flexibility in certain aspects of the application and selection process, HUD has explained, "the processes must conform to established rules and regulations, including fair housing civil rights laws and regulations, and must result in consistent, non-discriminatory determinations on applicant eligibility, placement of applicants on the waiting list,

---

[5] *See, e.g., Housing Choice Voucher Program Guidebook ("HCV Guidebook"), Chapter 2*: *Expanding Housing Opportunities and Mobility*, *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_11746.pdf.

and selection of applicants from the waiting list."  To enhance HCV program accessibility, PHAs are encouraged to "offer[] several locations and methods by which applicants may submit their applications, including … by mail, fax, telephone, e-mail, or other electronic formats."[6]

34.    Because of potentially discriminatory effects, PHAs are prohibited from refusing to provide Section 8 vouchers to families simply because of where they live before admission to the program. 24 C.F.R. § 982.202(b)(1).  PHAs may not require applicants to be residents of the city, town, or jurisdiction in which the PHA is situated.  *See* 24 C.F.R. § 982.207(b)(1)(i) ("Residency requirements are prohibited.").

35.    PHAs are also prohibited from imposing local preferences that are discriminatory or that have the purpose or the effect of denying admission to the program on the basis of race, color, or national origin. *See* 24 C.F.R. § 982.207(b)(1)(i) & (iii); *see also* 24 C.F.R. § 5.105(a)(1).  Local preferences that favor residents of communities that are overwhelmingly White and Non-Hispanic disproportionately favor those groups over Hispanic and Non-White families, and over time have the effect of perpetuating segregation.

36.    In addition to not adopting discriminatory policies and preferences, PHAs have an affirmative obligation to further fair housing in the administration of the HCV program.  *See* 24 C.F.R. § 982.53(b)-(c).  The U.S. Housing Act, as amended by the QHWRA, directs PHAs to "carry out the public housing agency plan in conformity with [Title VI of the Civil Rights Act, the FHA, the Rehabilitation Act of 1973, and the Americans with Disabilities Act]" and to "affirmatively further fair housing." 42 U.S.C.A. § 1437c–1(d)(15).  PHAs must accurately certify

---

[6] *Waiting List Admissions*, PIH Notice 2012-34, U.S. Department of Housing and Urban Development, Aug. 13, 2012, *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=pih2012-34.pdf.

to HUD that their programs conform to these civil rights requirements.  24 C.F.R. § 903.7(o).

37.     HUD emphasizes that to meet their fair housing obligations, PHAs must examine their programs to identify and address impediments to fair housing.  This includes addressing the fact that families in racially concentrated areas of poverty are often limited in their ability to move across PHA lines, about which HUD advises PHAs that providing "housing counseling and transportation assistance may help accomplish these goals and contribute to voucher holders' success."  65 Fed. Reg. 81214-01, 81216; *see also HCV Guidebook* § 2.9.

## FACTS

### A.     Equalla Jenkins was Denied Participation in the HCV program

38.     Ms. Jenkins is an African-American single mother and a survivor of domestic violence. At the time she saw the MHA waiting list announcement in or around October 2013, Ms. Jenkins and her child were housed by a social services agency that assists victims of domestic violence, first in a shelter and later in a transitional housing apartment.  Ms. Jenkins and her child are now homeless.

39.     Ms. Jenkins has diligently searched for housing, and with assistance has contacted and applied for numerous housing programs throughout Connecticut hoping for a chance to move her family into stable, permanent housing.

40.     Ms. Jenkins saw MHA's waiting list reopening announcement posted in October 2013 and timely submitted a pre-application.

41.     Because Ms. Jenkins neither lived nor worked in MHA's service area, she did not qualify for MHA's residency preference.  However, she did qualify for two other preferences, and received additional points in the lottery for being a survivor of domestic violence and because her family included a child under the age of 18. In mid-November 2013, MHA sent Ms. Jenkins

a letter stating that she had been selected by the lottery and had been placed on the waiting list for a voucher.

42.    In March 2014, MHA contacted Ms. Jenkins to begin the eligibility assessment process. Upon information and belief, MHA initiated the assessment because Ms. Jenkins was at or near the top of the list of applicants waiting to be issued a voucher.  Ms. Jenkins timely submitted the requested documentation.

43.    Ms. Jenkins was, at all times relevant, "extremely low income" and therefore income-eligible to participate in the HCV program.

44.    Nevertheless, MHA deemed Ms. Jenkins ineligible to participate in the voucher program because it asserted she did not meet its minimum income requirement of $165 per month, which, according to MHA's Administrative Plan, exists "to comply with the Total Tenant Payment Formula [24 C.F.R. § 5.628] (See Chapter 6) which requires the family to pay a minimum of $50 for rent and utilities." Admin. Plan 3-II.A.

45.    Ms. Jenkins requested and was granted a hearing to review the determination.  At the hearing on April 17, 2014, Ms. Jenkins provided documentation showing that she had been hired at Bob's Stores in Middletown, Connecticut for 15 hours per week.  Consequently, the hearing officer held that Ms. Jenkins would be reinstated to the waiting list if she provided, by May 16, 2014, (1) documentation from Bob's Stores stating her hourly wage, and (2) documentation that she owns a car that is properly registered in Connecticut.

46.    MHA's Administrative Plan states it may request verification of income and expected changes in income, but it does not state that participating families may be required to provide proof of vehicle ownership.  Mirroring HUD regulations, the Administrative Plan states that included in income calculations are the full amount, before payroll deductions, of wages and salaries, overtime

pay, commissions, fees, tips and bonuses, and other compensation for personal services.  Neither the Administrative Plan nor HUD regulations state a geographical limitation for wages and salaries that may be included in the income calculation nor a proof-of-transportation requirement.

47.      Ms. Jenkins provided a letter from Bob's Stores indicating that she would work 15 hours per week at a rate of $9.00 per hour.  MHA acknowledged that this was sufficient to satisfy its monthly minimum of $165 per month.

48.      Ms. Jenkins owned a car that was not registered in Connecticut.  When she attempted to register her car on or about May 10, 2014, she learned that she owed car taxes that had to be repaid before she could register it.  Ms. Jenkins' transitional housing case manager contacted MHA and informed it that Ms. Jenkins had been unable to register the car before the deadline and asked that the requirement be waived.

49.      MHA refused to waive the requirement or extend the deadline.

50.      Nevertheless, the case worker notified the housing authority that Ms. Jenkins had secured the assistance of her cousin, who agreed to help her with her commute to ensure she could get to and from work until her own car was registered in Connecticut, and provided MHA a letter stating as much together with proof of valid car registration for her cousin's vehicle.  Ms. Jenkins' case manager explained to MHA that Ms. Jenkins would pay the taxes and register her car after she received a few paychecks from her new job at Bob's Stores and that the issue would therefore be resolved before she actually received the voucher.

51.      MHA rejected the cousin's commitment to providing rides as insufficient.  MHA wrote in a letter to the case worker that the Hearing Officer's decision is final and "I would strongly encourage you to help [Ms. Jenkins] find 'a couple hundred dollars' (through family assistance, or your agency, or others), register her vehicle, and forward a copy of the registration to our office as

soon as possible."

52.     Ms. Jenkins' case worker replied that "[s]he has a reliable way to get back and forth from her employment in Middletown until she obtains other employment in the Mansfield area.  It is unfair to deny her this opportunity due to complications she is now having to obtain [car registration documentation].  Section 8 does not require a registered vehicle to enter the program. Please do not deny this mother the opportunity that she needs to move forward.  Thank you."

53.     MHA refused requests to reconsider its decision despite acknowledging that its Administrative Plan did not require HCV program participants to have registered automobiles. Defendant Fields explained, in a letter dated May 22, 2014, that the basis for the decision was a combination of MHA's minimum income requirement and the requirement that residents lease a unit within its jurisdiction for at least 12 months.  "The income requirement, alone, was not an issue.  In order to count her income, she needed to show us that she could meet the requirement of moving to our jurisdiction while transportation herself to her job in Middletown which we were using to make her income qualified."

54.     Defendant Fields opined that even if Ms. Jenkins could register her car and drive herself, it was neither plausible nor reasonable to believe that a low-income person would commute between Mansfield and Middletown for a part-time job, writing:

> For her to drive herself would be 1.5-2 hours of travel and 80 miles each day she worked.  At $9.00 per hour and 10-15 hours per week (and probably not two full time days) how is it feasible for Equalla to live here and work in Middletown?  […] How will Equalla pay for gas when her gross income from Bob's Stores will be $135.00, if she works 15 hours?  These are some of the questions we look at when trying to determine how reasonable and probable it is that the person will actually live here and work 35-40 miles away with no public transportation and no personal vehicle…
>
> It is financially unfeasible and unrealistic to believe that someone will travel many hours to work at a job that is part time and/or paying just over minimum wage.

55.    Defendant Fields' representations that there existed "no public transportation" and Ms. Jenkins had "no personal vehicle" were false.

56.    Even though Defendants' decision to deny Ms. Jenkins Section 8 assistance was based solely on speculation that she may at some point in the future lose her employment, MHA failed to inform her that if she actually lost her employment she would be entitled to a financial hardship exemption from the minimum rent requirement pursuant to statute, regulation, and MHA's own administrative plan.  *See* 42 U.S.C. § 1437a(a)(3)(B)(i)-(ii); 24 C.F.R. § 5.630(b)(1)-(2).[7]

57.    Defendants failed to inform Ms. Jenkins of potential employment opportunities in the MHA area, and about other transportation options that might assist to keep her job in Middletown while she lived in the MHA area.

58.    Even if MHA's minimum income requirement and concomitant proof-of-transportation requirements were permissible eligibility criteria, Defendants refused to consider all relevant mitigating circumstances when it decided to deny Ms. Jenkins assistance.  While the regulations encourage, but do not require, such considerations, 24 C.F.R. § 982.552(c)(2)(i), MHA's Administrative Plan removes the discretion HUD afforded, stating that "[t]he PHA **will consider** the following factors [before denying assistance]" (emphasis added), listing, *inter alia,* "the

---

[7] QWHRA mandates that PHAs grant exemptions from the minimum rent for anyone facing financial hardships, which include when: (1) a family has lost eligibility or is awaiting an eligibility determination for governmental assistance; (2) a family would be evicted as result of the imposition of the minimum rent requirements; (3) the income of the family has decreased because of changed circumstance, including loss of employment; or (4) a death in the family has occurred. 42 U.S.C. § 1437a(a)(3)(B)(i); 24 C.F.R. § 5.630(b)(1)-(2).  When a financial hardship exemption is requested the PHA must suspend the minimum rent for a 90-day period and determine whether the financial hardship is short- or long-term.  § 1437a(a)(3)(B)(ii); 24 C.F.R. § 5.630(b)(2).

seriousness of the case, especially with respect to how it would affect other residents" and "the effects that denial of assistance may have on other members of the family who were not involved in the action or failure."  Admin Plan 3-III.C.

59.     In violation of MHA's Administrative Plan, Defendants failed to consider that Ms. Jenkins's sole offense was inability to afford to register her out-of-state vehicle by the arbitrary deadline, that her conduct had and would have no impact on other residents, that she violated no program rules or family obligations, and that denial of assistance would cause her son to remain homeless even though he was not involved in the conduct MHA deemed a failure to satisfy obligations.

## B.  MHA's Minimum Income Requirement Violates the United States Housing Act and Implementing Regulations

60.     Defendants have a policy of categorically excluding families with a net income below $165 per month from its HCV program.

61.     This policy violates federal statutes and regulations and the stated purpose of the HCV program and is also contrary to HUD guidance.

62.     There exists no statutory or regulatory basis for PHAs to require applicants to meet a minimum income requirement to qualify for assistance to the HCV program.  HUD expressly prohibits such requirements.[8]

63.     Families with incomes below $165 per month are "extremely low income" and are therefore income-eligible to participate in the HCV program.  *See* 24 C.F.R. § 982.201(b)(1)(i).

64.     MHA's purported authority for adopting a minimum income requirement is that "HUD

---

[8] *Expanding Opportunities* at 7.

permits a PHA to establish additional categories of low-income families that may be determined eligible." Admin. Plan 3-II.A. MHA improperly applies the criteria defining this additional category to all applicant families, including those that are "very low income." *See* 24 C.F.R. § 982.201(b)(1)(iii).

65. The stated purpose of MHA's minimum income requirement, as stated in the Administrative Plan, is "to comply with the Total Tenant Payment Formula [24 C.F.R. § 5.628] (See Chapter 6) which requires the family to pay a minimum of $50 for rent and utilities." Admin. Plan 3-II.A.

66. No minimum income is required for a family "to comply with the Total Tenant Payment Formula," which is a rent calculator and not an eligibility criterion. The formula simply uses the family's income – whatever it may be – to determine the total amount the household pays for rent and utilities. Specifically, the TTP is the highest of 30% of adjusted income, 10% of gross income, *or* the minimum rent. Admin. Plan 6-III.B. A family with zero income would, in compliance with the formula, have its TTP set at the minimum rent.

67. MHA is aware that families earning less than $165 per month are income-eligible for the HCV program.

68. MHA's Administrative Plan states that "if the family has reported zero income, the PHA will conduct an interim reexamination every month as long as the family continues to report that they have no income." Admin. Plan 11-II.C.

69. Because MHA's minimum income requirement is expressly tied to the minimum rent, the requirement violates HUD's prohibition against using an applicant family's inability to pay the minimum rent to deny admission to the HCV program.

70. Defendants have a policy of making determinations about inability to pay the minimum

rent based on speculation regarding applicants' perceived future income, which prejudicially and arbitrarily excludes applicants like Ms. Jenkins who do not satisfy MHA's unlawful criterion.

71.    Defendants' policy of denying assistance based on inability to pay the minimum rent deprives families of their right to request and obtain a financial hardship exemption from the minimum rent.

72.    MHA's Administrative Plan states that pursuant to federal regulations it "must grant an exemption from the minimum rent if a family is unable to pay the minimum rent because of financial hardship," including when "the family would be evicted because it is unable to pay the minimum rent" or "family income has decreased because of changed family circumstances, including the loss of employment."  Admin. Plan 6-III.B.

73.    MHA's minimum income requirement excludes from its HCV program all families who would meet the financial hardship exemption criteria, including families who are awaiting an eligibility determination for governmental assistance, who would be evicted due to inability to pay, and whose income has decreased because of changed circumstances such as loss of employment.  These families are therefore pre-emptively deprived of a rule of which they were the intended beneficiaries.

74.    Defendants unlawfully based their decision to deny assistance to Ms. Jenkins on speculation concerning (1) her ability to keep her income above the minimum required, and (2) her future ability to pay the minimum rent.  Neither is a valid basis for denial.

**C.    MHA's Minimum Income Requirement was not Properly Adopted**

75.    HUD requires that local PHAs adopt a definition that identifies the "the basic criteria for determining a substantial deviation or amendment" from its Annual Plan. *See* 24 C.F.R. § 903.7(r)(2).

76.     Beginning with its 2002 Annual Plan, MHA has defined "Significant Amendment or Modification to the Annual Plan" as follows:  "If the mission of the Housing Authority changes, this will be considered a significant amendment." Annual Plan (2002) at 8. Upon information and belief, MHA's definition is insufficiently vague to satisfy its statutory and regulatory obligations.

77.     Raising the minimum income required to participate in a low-income housing program to greater than zero, which has been the standard for the HCV program nationwide since its inception, constitutes a change in "the mission of the Housing Authority."  Establishing a minimum income requirement accordingly constituted a significant amendment or substantial deviation to MHA's Agency Plan.

78.     Because adopting the minimum income requirement was a significant amendment or substantial deviation, MHA was required to:

    a.   consult with the Resident Advisory Board;

    b.   ensure consistency with the Consolidated Plan of the jurisdiction(s);

    c.   provide for a review of the amendments/modifications by the public during a 45-day public review period (as defined in 24 CFR § 903.17);

    d.   hold a vote held at a duly called a meeting of its Board of Directors (or similar governing body); and

    e.   notify HUD of the amendment or modification and receive approval in accordance with HUD's plan review procedures (as defined at 24 CFR § 903.23).

79.     Upon information and belief, MHA did not complete these requirements and the amendment has not, therefore, taken effect.

**D.     <u>MHA Discriminated Against Ms. Jenkin by Denying her Application for Assistance.</u>**

i.     <u>MHA Intentionally Discriminated Against Ms. Jenkins on the Basis of Race.</u>

80.     Ms. Jenkins is African-American.

81.     Ms. Jenkins was qualified and eligible to participate in MHA's HCV voucher program.

82.     Defendants refused to allow Ms. Jenkins the opportunity to become a participant in its HCV program while the voucher remained available.

83.     Defendants' refusal was based on a requirement that does not appear in any law, regulation, or administrative plan, specifically that Ms. Jenkins must prove that she owns a vehicle so that MHA could decide whether it believes she could keep her job.

84.     Upon information and belief, Defendants' refusal was pre-textual.

85.     Despite their knowledge that Ms. Jenkins already had a job that would pay her more than the minimum required, Defendants continued to cite their unlawful minimum income requirement as a factor in its decision denying Ms. Jenkins assistance.

86.     Defendants also intentionally made false representations to Ms. Jenkins regarding the character of the area and the availability of public transportation in order to justify rejecting her application.

87.     In their letter denying Ms. Jenkins' application, Defendants falsely represented that because of the area's "rural character" there is "no public transportation" capable of transporting her to and from Middletown and she consequently must prove she owns a vehicle validly registered in Connecticut.

88.     Defendants cited the lack of public transportation as a basis for denying Ms. Jenkins assistance despite their knowledge that Ms. Jenkins owned a vehicle that would soon be registered.

89.     Moreover, contrary to Defendants' representations, public transportation connects Mansfield to Middletown and many other towns and cities.

90.     The Town of Mansfield, which is the site of the main campus of the University of

Connecticut, has completed the first phase of a years-long project to develop a downtown area called "Storrs Center."  Storrs Center, which is directly adjacent to the university campus, is billed as a "mixed-use town center where an eclectic mix of restaurants, shops, offices, homes, walkways, and green spaces create a connected, thriving community for everyone in the region." The Town of Mansfield advertises that 414 new residential apartments have been developed and over thirty centrally located new businesses have opened.  The Town of Mansfield states that the second and third phases of the project will continue to expand the availability of residential units and commercial buildings to add more businesses within the pedestrian-oriented center.[9]

91.    As part of Storrs Center, the Town of Mansfield has developed the Nash-Zimmer Transportation Center, described as a "central transportation node" that, *inter alia*, integrates public and private inter-city transit options connecting Mansfield to cities and towns throughout Connecticut and beyond, including Boston, Providence, and New York City.  The transportation hub also provides facilities for bicycle commuters such as racks, showers, lockers, and storage. The Town of Mansfield also promotes the availability of a "shared cars" system located in Storrs Center that it co-sponsors with the University of Connecticut.[10]

92.    Connecticut Transit (CTTRANSIT), the state-owned public bus service, operates a Commuter Express Service to Hartford with stops in multiple locations within the MHA Section

---

[9] *See* Explore, www.storrscenter.com, http://www.storrscenter.com/ (last visited Feb. 1, 2016); *see also* Frequently Asked Questions About Storrs Center, www.mansfieldct.gov, http://www.mansfieldct.gov/mdp/faqs (last visited Feb. 1, 2016).

[10] A Look Ahead, www.mansfieldct.gov, http://www.mansfieldct.gov/content/1914/6514/6518/default.aspx (last visited Feb. 1, 2016).

8 program service area, including in Mansfield and Coventry, towns with the MHA's service area.[11]   From Hartford, CTTRANSIT offers bus service that connects to cities and towns throughout Connecticut, including Middletown.

93.     The Town of Mansfield is also in the Windham Region Transit District, which operates a shuttle that runs frequently between Mansfield and the nearby village of Willimantic in the Town of Windham. From Willimantic, a number of transit options are available, including CTTRANSIT service to Hartford, commuter service to Norwich and Foxwoods Resort Casino, and more.

94.     MHA was aware that representing that its service area lacks public transit may discourage non-White applicants residing outside its service area from applying for the HCV program given the disproportionately lower rates of vehicle ownership among people of color in Connecticut.

95.     MHA has a record of discouraging families residing in Connecticut's urban centers, which are disproportionately non-White, from applying for its HCV program.

96.     MHA's Section 8 Administrative Plan provides that it will maintain a waiting list of 250 applications.  When the waiting list is reopened, the Administrative Plan states that MHA will advertise the opening through announcements placed in the Willimantic Chronicle, notifications to the social service departments within the MHA service area towns and notice posted to cthcv.org.  After advertising the reopening, pre-applications are accepted.

97.     MHA has traditionally included in its waiting list reopening announcements, including in

---

[11] *Routes & Schedules*, CT Transit,
http://www.cttransit.com/routesschedules/transportationresources.asp (last visited Feb. 1, 2016).

2008, 2010, and 2013, that its service area is "rural" and that there is limited or no public transportation in the area.

98.    In August 2013, MHA circulated an announcement stating its Section 8 waiting list would be open for a three-day period.  The Connecticut Fair Housing Center objected to certain portions of MHA's waiting list announcement and to certain application submission requirements. Specifically, the Center objected to the statement in the announcement that **"[t]hese towns are RURAL communities and PUBLIC TRANSPORTATION IS VERY LIMITED OR NON EXISTENT"** (emphasis in original) because it may discourage applicants from outside of MHA's service area from applying.

99.    MHA's Executive Director, Defendant Rebecca Fields, acknowledged in a letter that describing the service area as rural and lacking in public transportation "may cause some people to decide not to complete an application."  She explained that MHA intended to accomplish this deterrent effect, reasoning that "[b]y not providing information on the living environment we keep people ignorant and unable to make informed decisions.  Providing information [on the living environment] empowers people to make a decision as to whether or not *they want* to submit an application…" (Emphasis in original.)

100.    The only "information on the living environment" MHA determined was needed in order to not "keep [prospective applicants] ignorant" was that the towns are "rural communities" with "very limited" public transportation.  MHA did not provide information on the quality of housing in the area, the school systems, available social services, employment opportunities, higher education opportunities, or the many and varied public transportation options that are, in fact, available.

101.    Defendant Fields wrote that MHA was concerned that without including these

descriptions in its announcements, "urbanites" would go through the application process and then give up their vouchers because of the requirement to move to the MHA service area for at least the first year.

102.    Defendant Fields added that MHA was particularly concerned about those "urbanites" who "have not ventured far from their urban surroundings" and "are *totally* unfamiliar with the restrictions of transportation or the near requirement to have your own transportation when living in a rural area."  (Emphasis in original.)

103.    Defendant Fields explained that MHA was worried that some "urban" applicants may be unable to use a voucher due to lack of transportation and others may "actually move here, hate it, because it is too dark, too quiet, they are afraid because there are 'no people around.'"

104.    Defendants described the service area as rural and without public transportation because of stereotypes and assumptions about the knowledge, experiences, and housing-related desires of applicants from applicants who currently reside in urban areas.

105.    Despite Defendants' insistence that the description provided of MHA's service area ensures that "urbanites" are able to avoid making uninformed decisions about where to live, Defendants ultimately agreed to modify the language in response to the Center's objections.

106.    Although it agreed to remove this language from the 2013 waiting list reopening announcement, MHA continued to selectively describe the area as rural and lacking in public transportation prospective participants in its HCV program such as Ms. Jenkins.

107.    By failing to provide accurate information about its housing programs, MHA intentionally erected a barrier that made it more difficult for economically disadvantaged minorities to obtain a housing benefit than it is for non-minorities.  MHA did so intentionally and targeted its misleading information at people who reside in disproportionately non-White urban areas.

108.     The false and misleading information given to prospective voucher holders was intentional and harmed families who may have based decisions not to apply for assistance on MHA's misrepresentations.

109.     The false and misleading information given to Ms. Jenkins was intentional and was used as the basis for denial of her application for assistance.

110.     There existed no lawful justification for denial of Ms. Jenkins' application for housing assistance.

ii.     <u>MHA's Minimum Income Requirement Discriminates on the Basis of Race in Violation of the Fair Housing Act</u>.

111.     Defendants' minimum income requirement categorically excludes from its HCV program all families with zero income or with income below $165 per month.

112.     Families in Connecticut with income ranging from zero to $2,000 annually (approximately $165 per month) are more than 2.5 times more likely to be African-American as White, non-Hispanic families.[12]

113.     Defendants' minimum income requirement predictably and actually disproportionately denies eligibility to families who are African-American, including Ms. Jenkins' family.

114.     As of September 30, 2015, MHA reported that one voucher holder it served had no household income.  Statewide, nearly 1,500 households, or about five percent (5%) of all voucher

---

[12] Public Use Microdata Samples and American factfinder, *available at* www.census.gov.

holders, have no household income.[13]

iii.   <u>Defendants' Minimum Income and Live-in-Jurisdiction Requirements Operate as a De Facto Unlawful Residency Requirement</u>.

115.   Defendant Fields has summarized Defendants' policy as follows:  "It is the same [for] someone living in Hartford, Meriden, New Haven, Bridgeport, Stamford, New York, or across the country.  Unless the employer can transfer the applicant to a closer location and/or they have a vehicle to get to work, we can't count income that clearly will not be available at lease-up.  If moving to our jurisdiction, which is required, would cause a reasonable person to expect that the existing job would be lost due to the proximity between housing and the job and/or lack of transportation, then the income is not counted and the income requirement cannot be met."

116.   Defendants' policies effectively operate to intentionally disqualify applicant families employed outside MHA's jurisdiction unless they can prove that they meet one of two criteria: (1) they have a vehicle, which is five times less likely for African-American households as compared to White households (see *infra*) and will be able to commute to and from an existing job that is within a geographically range MHA deems financially feasible; or (2) the employer is willing to transfer the applicant to a closer location.

117.   Defendants' unlawful minimum income and concomitant transportation requirement, together with their policy that families must live in MHA's jurisdiction for their first year in the program, operates as a *de facto* residency requirement that excludes non-local families reliant on

---

[13] *Resident Characteristics Report for Mansfield Housing Authority HCV Program*, June-Sept 2015, U.S Department of Housing and Urban Development, *available at* https://pic.hud.gov/pic/rcrpublic/rcrmain.asp (hereafter "Resident Characteristics Report").

work income.

118.    Defendants' policies violate the prohibition on refusing assistance based on where a family lived before admission to the program, 24 C.F.R. § 982.202(b)(1), and the prohibition against requiring applicant families to be residents of the city, town, or jurisdiction in which the public housing agency is situated.  *See* 24 C.F.R. § 982.207(b)(1)(i).

119.    Defendants cited their unlawful *de facto* residency requirement as the basis for denial of Ms. Jenkins' application for assistance.

iv.    Defendants' Residency Preference Violates HUD Rules and the Fair Housing Act.

120.    In addition to the residency restrictions already described, MHA has an explicit residency preference that gives applicants already living or working within its service area a greater likelihood of being selected from its weighted lottery system and obtaining vouchers.

121.    Because of the demographics of the MHA service area, the residency preference makes it slightly more likely that White, non-Hispanic families are able to obtain housing assistance than similarly situated African-American families.

122.    As compared with the State of Connecticut, housing in MHA's service area is occupied by a disproportionately high number of White, non-Hispanic households and disproportionately few African-American households.

123.    MHA operates the HCV program in Mansfield, Ashford, Coventry, Chaplin, and Willington.  The demographics of each of these towns are disproportionately White, non-Hispanic, with very few African-American households.  According to the 2013 American Community Survey five-year estimates, 93.1% of housing units in Ashford are occupied by White, non-Hispanic households and only 1.1% by African-American households. Similarly, White, non-Hispanic households occupy 96.2% of housing units in Coventry, 95.7% in

Willington 93.7% in Chaplin, and 89.8% in Mansfield.  Black/African-American households

occupy 0% of housing units in Willington and Chaplin, 0.5% in Coventry, 0.9% in Mansfield,

and 1.2% in Ashford.[14]

124.     By comparison, households in the State of Connecticut are roughly 75.7% White, non-

Hispanic and 9.8% African-American.[15]

125.     Even greater disparities exist among renter households.  African-American families occupy

17.9% of rental units statewide compared with roughly zero percent (0%) in Ashford, Chaplin,

Willington, and Coventry, and 1.4% in Mansfield.[16]

126.     A comparison between households that are income-eligible to participate in the HCV

program illustrates how MHA's residency preference operates to disproportionately exclude

African-American households.  Although "extremely low income" (ELI) households are required

to comprise nearly three quarters of the HCV program's participants, roughly zero percent (0%)

of ELI households living in the MHA service area are African-American and 89.9% are White,

non-Hispanic.  Statewide, only 3.4% of ELI households are White, while 29.1% are African-

American.[17]  Likewise, among "very low income" (VLI) households in the MHA area, roughly

---

[14] ACS Demographic Characteristics for Occupied Housing Units, 2009-2013 ACS 5-Year Estimates, S2502, for all towns in the MHA service area, *available at* http://factfinder.census.gov. [hereinafter "S2502"].

[15] S2502, for State of Connecticut.

[16] *Compare* S2502, Towns in MHA Service Area, *supra* note 14, *with* S2502, State of Connecticut, *supra* note 15.

[17] 40.8% are non-White Hispanic.

zero percent (0%) are African-American and 85.1% are White, non-Hispanic, while statewide these numbers are 11.8% and 67%, respectively.[18]   A table representing these disparities is attached hereto as Exhibit A.

127.    Because of the comparative demographics of the MHA service area, MHA's residency preference operates to maintain and reinforce racially segregated housing patterns and has an adverse disparate impact on African-American residents of Connecticut who do not live in MHA's jurisdiction.

128.    The impact of the residency requirement and preference is magnified here because Defendants employ both a discriminatory preference favoring local residents on the waiting list and a policy or practice of requiring non-local applicants to prove that they will continue to meet the minimum income requirement when they relocate to MHA's service area.   MHA excludes non-local applicants as ineligible based if it determines that, according to Defendant Fields, "moving to [its] jurisdiction, which is required, would cause a reasonable person to expect that the existing job would be lost due to the proximity between the housing and the job and/or lack of transportation."

v.    MHA's Preference against Low-Wage and/or Part-Time Workers Discriminated on the Basis of Race.

129.    Defendants have a policy of denying assistance to part-time and/or low-wage workers who are employed outside its jurisdiction because they consider commuting "financially unfeasible and

---

[18] Comprehensive Housing Affordability Strategy Data ("CHAS Data"), 2008-2012 ACS 5-Year Estimates, *available at* http://www.huduser.gov/portal/datasets/cp.html.

unrealistic" for "part-time and/or low-wage workers."

130.    Part-time and low-wage workers in Connecticut are disproportionately likely to be African-American. According to census data, nearly sixty percent of African-Americans households in Connecticut either worked part-time or worked full-time year-round and remained below the poverty level compared to only thirty-eight percent of White, non-Hispanic households.[19]

vi.    <u>MHA's Requirement that Certain Applicants Provide Proof that they Own Vehicles Discriminates on the Basis of Race</u>.

131.    MHA imposed on Ms. Jenkins a requirement that she provide proof that she has a validly registered vehicle.

132.    Upon information and belief, MHA selectively imposes this requirement on applicants from urban areas outside its service area who receive income from work.

133.    Families in Connecticut with no vehicle are disproportionately African-American.  In 2013, 24.1% of African-American households did not own a vehicle compared with only 5.5% of non-Hispanic White households.[20]

134.    MHA's requirement that certain applicants prove vehicle ownership predictably and actually disproportionately denies eligibility to African-American applicants.

vii.    <u>Effects of MHA's Discriminatory Admissions Policies</u>

135.    As a consequence of Defendants' admissions policies set forth above, the demographics of MHA's voucher holders are overwhelmingly disproportionately White, non-Hispanic as compared

---

[19] *Poverty Status by Work Experience*, ACS 2006-2010, B17009, *available at* http://factfinder.census.gov/.

[20] *Tenure by Vehicles Available – Universe: Occupied Housing Units*, ACS 2006-2010, B25044, *available at* http://factfinder.census.gov/.

to Connecticut as a whole.

136.    White, non-Hispanic households use only 23% of Connecticut's total vouchers compared with 75% of those administered by the MHA.  In contrast, African-American households comprise 34% of statewide voucher holders but only 11% of MHA's.[21]

**COUNT I:    Violation of 42 U.S.C. § 1437 *et seq.* and its Implementing Regulations, Pursuant to 42 U.S.C. § 1983**

137.  Plaintiff repeats and re-alleges the foregoing paragraphs of the Complaint as though fully set forth herein.

138.  Defendants' policies and practices have violated Ms. Jenkins' rights under the United States Housing Act, 42 U.S.C. § 1437 *et seq.*, and the HUD regulations promulgated thereunder actionable pursuant to § 1983, by:

      a.    Imposing an unlawful requirement that applicants, including Ms. Jenkins, earn a minimum income of $165 per month to be eligible for the HCV program;

      b.    Imposing an unlawful requirement that certain applicants, including Ms. Jenkins, prove that they own a registered vehicle and that it is registered in Connecticut to be eligible for the HCV program;

      c.    Depriving prospective participants in the HCV program, including Ms. Jenkins, of the opportunity to obtain financial hardship exemptions from the $50 monthly minimum rent by denying HCV assistance to applicants because of their financial hardships;

      d.    Failing to notify applicants, including Ms. Jenkins, of their right to request a

---

[21] *See* Resident Characteristics Report, *supra* note 13.

financial hardship exemption from $50 minimum rent, the criteria on which the hardship exemptions may be granted, and the process for hardship determination;

e.      Failing to consider all the relevant circumstances of applicants', including Ms. Jenkins, situations before denying their applications;

f.      Imposing admissions criteria that effectively constitute unlawful residency requirements;

g.      Imposing a local preference that has the effect of discriminating on the basis of race and color; and

h.      Failing to affirmatively further fair housing.

139.    Ms. Jenkins has been injured by Defendants' policies and practices and has suffered damages as a result.

**COUNT II:  Violation of the Due Process Clause of the United States Constitution**

140.    Plaintiff repeats and re-alleges the foregoing paragraphs of the Complaint as though fully set forth herein.

141.    Defendants violated Ms. Jenkins' rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, actionable pursuant to § 1983, by:

a.      Denying admission to the HCV program based on arbitrary, unlawful, and selective criteria;

b.      Depriving applicants to the HCV program, including Ms. Jenkins, of the opportunity to obtain financial hardship exemptions from the $50 monthly minimum rent by denying HCV assistance to applicants because of their financial hardships;

c.      Failing to notify applicants, including Ms. Jenkins, of their right to obtain a

financial hardship exemption from $50 minimum rent, the criteria on which the hardship exemptions may be granted, and the process for hardship determination; and

d.      Failing to consider all relevant circumstances when it decided to deny Ms. Jenkins' application to participation in the program.

142.    Ms. Jenkins has been injured by Defendants' conduct and has suffered damages as a result.

**COUNT III:  Connecticut Tort of Negligence per se**

143.    Plaintiff repeats and re-alleges the foregoing paragraphs of the Complaint as though fully set forth herein.

144.    Defendants owed a duty to Ms. Jenkin to administer their HCV program consistent with the procedures and obligations set forth in the United States Housing Act, 42 U.S.C. § 1437 *et seq.*, and the HUD regulations promulgated thereunder.

145.    Specifically, MHA owed Ms. Jenkins a duty: (a) not to deny her assistance based on impermissible grounds (24 C.F.R. § 982.552(c)); (b) not to deny her assistance based on improper income-eligibility requirements (24 C.F.R. §  982.201(b)(1)); (c) not to deprive Ms. Jenkins of the right to request and obtain a financial hardship requirement (24 C.F.R. § 5.630(b)(1)-(2)); (d) to consider all the relevant mitigating circumstances before denying her assistance (24 C.F.R. § 982.552(c)(2)(i) and MHA's Administrative Plan); (e) not to refuse to provide vouchers to families based on where they live before admission to the program or require applicants to be residents of its jurisdiction (24 C.F.R. § 982.202(b)(1) and 982.207(b)(1)); (f) not to impose local preferences that have the purpose or effect of discriminating on the basis of race and color (24 C.F.R. § 982.207(b)(1)(i) & (iii) and 24 C.F.R. § 5.105(a)(1)); and (g) to affirmatively further fair housing (24 C.F.R. § 982.53(b)-(c)).

146.    Defendants violated the duties set forth in the United States Housing Act and HUD regulations promulgated thereunder by:

a.    Imposing an unlawful requirement that applicants, including Ms. Jenkins, earn a minimum income of $165 per month to be eligible for the HCV program;

b.    Imposing an unlawful requirement that certain applicants, including Ms. Jenkins, prove that they own a registered vehicle and that it is registered in Connecticut to be eligible for the HCV program;

c.    Depriving prospective participants in the HCV program, including Ms. Jenkins, of the opportunity to obtain financial hardship exemptions from the $50 monthly minimum rent by denying HCV assistance to applicants because of their financial hardships;

d.    Failing to consider all the relevant circumstances of applicants', including Ms. Jenkins, situations before denying their applications;

e.    Imposing admissions criteria that effectively constitute unlawful residency requirements;

f.    Imposing a local preference that has the effect of discriminating on the basis of race and color; and

g.    Failing to affirmatively further fair housing.

147.    Ms. Jenkins has been injured by Defendants' policies and practices and has suffered damages as a result.

148.    Defendants' breach of their duties directly and proximately caused Ms. Jenkins' injuries and damages.

149.    Defendants' breach of the duties set forth in the United States Housing Act and its implementing regulations constitutes negligence per se.

## COUNT IV:  Connecticut Tort of Negligence

150.    Plaintiff repeats and re-alleges the foregoing paragraphs of the Complaint as though fully set forth herein.

151.    Defendants owed Ms. Jenkins a duty to exercise care in the administration of the HCV program commensurate with the procedures and obligations set forth in the United States Housing Act and its implementing regulations.

152.    Specifically, MHA owed Ms. Jenkins a duty: (a) not to deny her assistance based on impermissible grounds (24 C.F.R. § 982.552(c)); (b) not to deny her assistance based on improper income-eligibility requirements (24 C.F.R. §  982.201(b)(1)); (c) not to deprive Ms. Jenkins of the right to request and obtain a financial hardship requirement (24 C.F.R. § 5.630(b)(1)-(2)); (d) to consider all the relevant mitigating circumstances before denying her assistance (24 C.F.R. § 982.552(c)(2)(i) and MHA's Administrative Plan); (e) not to refuse to provide vouchers to families based on where they live before admission to the program or require applicants to be residents of its jurisdiction (24 C.F.R. § 982.202(b)(1) and 982.207(b)(1)); (f) not to impose local preferences that have the purpose or effect of discriminating on the basis of race and color (24 C.F.R. § 982.207(b)(1)(i) & (iii) and 24 C.F.R. § 5.105(a)(1)); and (g) to affirmatively further fair housing (24 C.F.R. § 982.53(b)-(c)).

153.    Defendants breached these duties by:

       a.    Imposing an unlawful requirement that applicants, including Ms. Jenkins, earn a minimum income of $165 per month to be eligible for the HCV program;

       b.    Imposing an unlawful requirement that certain applicants, including Ms.

Jenkins, prove that they own a registered vehicle and that it is registered in Connecticut to be eligible for the HCV program;

c.       Depriving prospective participants in the HCV program, including Ms. Jenkins, of the opportunity to obtain financial hardship exemptions from the $50 monthly minimum rent by denying HCV assistance to applicants because of their financial hardships;

d.       Failing to consider all the relevant circumstances of applicants', including Ms. Jenkins, situations before denying their applications;

e.       Imposing admissions criteria that effectively constitute unlawful residency requirements;

f.       Imposing a local preference that has the effect of discriminating on the basis of race and color; and

g.       Failing to affirmatively further fair housing.

154.    Ms. Jenkins has been injured by Defendants' conduct and has suffered damages as a result.

155.    Defendants' breach of their duties directly and proximately caused injuries to Ms. Jenkins.

156.    Defendants' breach of their duties owed to Ms. Jenkins constitutes negligence.

**COUNT V:  Disparate Treatment, Disparate Impact, and Discriminatory Statements in Violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.***

157.    Plaintiff repeats and re-alleges the foregoing paragraphs of the Complaint as though fully set forth herein.

158.    Defendants' policy and practice of imposing arbitrary and impermissible requirements, making material misrepresentations and omissions concerning its service area, and otherwise prohibiting or discouraging African-American families from applying to its HCV program make housing unavailable and deny rental housing because of race or color in violation of the

Fair Housing Act, 42 U.S.C. § 3604(c).

159.   Through their policy and practice of using arbitrary and impermissible requirements and/or preferences, making material misrepresentations and omissions concerning its service area, and otherwise prohibiting or discouraging African-American families from applying to its HCV program, Defendants have made, printed, or published, or caused to be made, printed or published notices, statements, or advertisements with respect to the rental of a dwelling that indicate a preference, limitation, or discrimination based on race or color, or an intention to make any such preference, limitation, or discrimination, in violation of the Fair Housing Act, 42 U.S.C. § 3604(c).

160.   Defendants' minimum income requirement discriminates on the basis of race or color by disproportionately excluding Black or African-American applicants from participation in HCV program in violation of 42 U.S.C. § 3604(a).

161.   Defendants' policy or practice of requiring certain applicants to prove that they own a registered vehicle discriminates on the basis of race by disproportionately excluding Black or African-American applicants from participation in HCV program in violation of 42 U.S.C. § 3604(a).

162.   Defendants' residency preference in favor of "local" residents within its jurisdiction discriminates on the basis of race by disproportionately excluding income-eligible Black or African-American applicants from its HCV program in violation of 42 U.S.C. § 3604(a).

163.   Plaintiff Jenkins has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

164.   Defendants' conduct was intentional, willful, and made in reckless disregard for the known rights of others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a. Declaring that the Defendants' actions violate the United States Housing Act, the Due Process Clause of the United States Constitution, and the Fair Housing Act;

b. Permanently enjoining Defendants from engaging in the conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including, but not limited to appointment of a monitor;

c. Awarding all available damages to Plaintiff including compensatory damages for economic losses, emotional distress, violation of her rights, and loss of housing opportunity;

d. Awarding punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e. Awarding reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c); and

f. Awarding such other and further relief as this Court may deem just and proper.

PLAINTIFF

By Counsel:     _____/s/_____
                Greg Kirschner (ct26888)
                Salmun Kazerounian (ct29328)
                Connecticut Fair Housing Center
                221 Main Street, 4th Floor
                Hartford, CT 06106
                Tel: (860) 263-0724/Fax: (860) 247-4236
                gkirschner@ctfairhousing.org